1                   UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF FLORIDA

2

                 Case No. 21-20173-CR-RNS

3

UNITED STATES OF AMERICA,    )

4                       )
     GOVERNMENT,           )

5                       )
     -v-               )

6                       )
TYRESE COOPER,          )

7                       )
     DEFENDANT.          )   Miami, Florida

8                      )   March 9, 2021
_____)

9

10    TRANSCRIPT OF VIDEO PRELIMINARY AND DETENTION HEARING

11        BEFORE THE HONORABLE JOHN J. O'SULLIVAN

12          UNITED STATES MAGISTRATE JUDGE

13

14 Appearances:

15 FOR THE GOVERNMENT         Hillary Irvin, ESQ., AUSA
                      U.S. Attorney's Office

16                       Southern District of Florida
                      99 Northeast 4th Street

17                       Miami, FL 33132

18 FOR THE DEFENDANT          Vanessa Chen, ESQ., AFPD
                      Federal Public Defender's Office

19                       150 West Flagler Street
                      Suite 1700

20                       Miami, FL 33130

21 Reporter                Stephen W. Franklin, RMR, CRR, CPE
  (561)313-8439          Official Court Reporter

22                       500 West Capitol Avenue
                      Little Rock, AR 72201

23                       E-mail: SFranklinUSDC@aol.com

24    Proceedings recorded by Digital Audio Recording, and
transcript prepared utilizing computer-aided transcription.

25

```
 1            (Call to the order of the Court.)
 2            THE COURT:  Good morning.  We're here today in the
 3   case of the United States of America versus Tyrese Cooper,
 4   case number 12 -- I'm sorry, 21-MJ-02323-Reid.
 5            Could I have appearances for the defendant first.
 6            MS. CHEN:  Good morning, Your Honor.  Vanessa Chen,
 7   Assistant Federal Public Defender, on behalf of Mr. Cooper,
 8   who has consented to proceed by Zoom and waive his in-person
 9   appearance.
10            THE COURT:  Oh, good.  Thank you.
11            And for the government?
12            MS. IRVIN:  Good morning, Your Honor, Hillary Irvin
13   on behalf of the United States.
14            THE COURT:  Okay.  This is on for a pretrial
15   detention hearing and a status conference in regards to
16   setting the preliminary arraignment date.
17            MS. IRVIN:  Yes, Your Honor.  The government is
18   seeking detention today based on risk of flight and danger to
19   the community and is ready to go forward.
20            THE COURT:  Okay.  And what is this status
21   conference in regards to the preliminary arraignment?
22            MS. IRVIN:  Your Honor, the government would ask for
23   a preliminary arraignment date after March 18th.  The
24   government anticipates that the defendant will be indicted on
25   March 18th, so a date after that time would work for the
```

1  government.

2          THE COURT:  Okay.  Is that good with you, Ms. Chen?

3          MS. CHEN:  No objection, Your Honor.  Thank you.

4          THE COURT:  So, I mean, is the 18th the day you're

5  going to indict him?  You want to do it on the 19th, or you

6  want to do it on the following week?

7          MS. IRVIN:  The following week would be good.

8          THE COURT:  Okay.

9          MS. IRVIN:  But we plan to indict on the 18th.

10          THE COURT:  Got it.

11          So March 22nd at 10:00 o'clock for an arraignment or

12  preliminary examination.  Well, I don't know, does he need --

13  do I need to talk to him about a waiver of the preliminary,

14  then?  Have you spoken to him about that, Ms. Chen?

15          MS. CHEN:  I have, Your Honor.  I think, in an

16  abundance of caution, if Your Honor wants to colloquy him on

17  the record.

18          THE COURT:  Yeah, I will.

19          Okay.  All right.  Let me see who your client is.

20  There you are, sir.

21          Tell me your name, sir.

22          THE DEFENDANT:  Tyrese Cooper.

23          THE COURT:  How you doing today, Mr. Cooper?

24          THE DEFENDANT:  Not so good.

25          THE COURT:  We're going to have a detention hearing.

1   We're going to determine if you'll be detained or released on

2   bond, but you're -- I wanted to let you know you're entitled

3   it a probable cause hearing within 14 days of your initial

4   appearance in court.  The government is asking to put the

5   preliminary examination or probable cause hearing over to

6   March 22nd.  Are you in agreement with that?

7           THE DEFENDANT:  Um . . .

8           THE COURT:  Are you in agreement with moving it over

9   to March 22nd?

10          THE DEFENDANT:  Um, yes.

11          THE COURT:  Yeah?  You have any questions about

12  that?  You don't sound --

13          THE DEFENDANT:  Yes.

14          THE COURT:  You don't sound too sure.

15          THE DEFENDANT:  What do that mean?  Like, I don't

16  know.

17          THE COURT:  Well, maybe it's best we just have the

18  probable cause hearing today.  We can do it at the same time

19  as the detention hearing.

20          THE DEFENDANT:  Yes.

21          THE COURT:  Okay?  I just sense you're not too --

22  too positive, or you don't sound too positive about that.

23          I'm not sure if this was read previously, but I'll

24  read it again in case it wasn't or in case defense counsel

25  wasn't present:  As required by Rule 5(f), the United States

1  is ordered to produce all exculpatory impeachment evidence to

2  the defendant pursuant to Brady versus Maryland and its

3  progeny.  Not doing so in a timely manner may result in

4  sanctions, including exclusion of evidence, adverse jury

5  instructions, dismissal of charges and contempt proceedings.

6        All right.  Ms. Irvin, you can proceed by proffer.

7  You have an agent here?

8        MS. IRVIN:  Yes, Your Honor.  Agent -- task force

9  agent Luis Gonzalez is present here.  I see his camera.

10        THE COURT:  Okay.  Where is Mr. Gonzalez?  I'd like

11  him to turn his camera on.  Mr. Gonzalez, (inaudible), or

12  agent Gonzalez.  Can you turn your video on?

13        THE WITNESS:  Present, Your Honor.

14        THE COURT:  Okay, good.  All right.  We'll swear you

15  if you made to testify in a few minutes.

16        All right.

17        THE WITNESS:  Yes, sir.

18        THE COURT:  Go ahead, Ms. Irvin.

19        MS. IRVIN:  Yes, Your Honor.  Like I said, the

20  government is seeking detention based on risk of flight and

21  danger to the community.  This is a presumption case under 18

22  U.S.C., 3142(e)(3)(B).

23        The facts in this case show that on June 30th, 2020,

24  at approximately 1:37 p.m., the store owner of a mobile phone

25  store called Mobile One in Miami Gardens was robbed at

1  gunpoint by three black males, one of which was identified as

2  Tyrese Cooper, who was carrying a firearm and brandishing a

3  firearm at the time of the robbery.  The Mobile One store has

4  video cameras, and the video surveillance cameras of the

5  incident show that three black males wearing hoodies and

6  facemasks covering the lower half of their phases entered the

7  Mobile One store.  When the store owner saw them coming, he

8  was afraid and ran to the back of the store to hide, and he

9  called the police.  The video surveillance cameras show that

10  Cooper and leading the pack of three males, and he's holding a

11  handgun that he points at the store employee.

12          The three males advanced into the store where there

13  is a glass case that holds cellphone, expensive cellphones.

14  Cooper broke the glass using his hand, his right hand, and the

15  gun.  And at the time, you can see on the video surveillance

16  cameras that the glass cut his hand badly, and he starts

17  bleeding on the case.  While he's bleeding and holding the

18  gun, the two other males reach into the phone case and steal a

19  number of expensive looking cellphones, and then they run out

20  of the store.

21          On the day of the incident, the Miami Gardens crime

22  scene employees came to the scene and recovered Mr. Cooper's

23  blood from the broken glass case and also from the front door

24  of the Mobile One phone store.  Those blood samples were sent

25  to the Miami-Dade Police Department lab for analysis.  The

1  analysis showed that the blood that was on the case and on the
2  door was Tyrese Cooper's blood.

3      On February 15th of 2021, this past a couple weeks
4  ago, the Mobile One phone store employee called the Miami
5  Gardens police detectives to tell them that Mr. Cooper had
6  returned to the Mobile One store and that he was afraid that
7  him and his friends would potentially rob the store again.
8  The Mobile One store employee asked the Miami Gardens officers
9  for protection.  The Miami Gardens officers looked at their
10 surveillance cameras again from the February 15, 2021, date,
11 and it shows that Cooper is standing in the Mobile One phone
12 store and has his arms out almost as if it's measuring the
13 phone -- measuring the glass case, and that additionally
14 caused the Mobile One store employee to fear for his life.

15     The facts also show that even though Mr. Cooper
16 doesn't have any convictions, he has numerous arrests
17 involving flight.  He has two arrests for resisting without
18 violence on two separate dates and an arrest for leaving the
19 scene of an incident -- leaving the scene of an accident.

20     Additionally, a week before his arrest, the
21 defendant was involved in a car accident.  Miami Gardens
22 officers told the defendant to come to the Miami Gardens
23 police station to discuss the accident and possibly a traffic
24 infraction, and Mr. Cooper did not come to the Miami Gardens
25 police precinct, and he also did not contact officers to

1  follow up.

2        Therefore, based on the offense from June 30th,

3  2020, and the aftereffects and the after incidents, the

4  government is seeking detention based on risk of flight and

5  danger to the community and has argument when Your Honor is

6  ready to hear it.

7        THE COURT:  I'm ready for it right now.

8        MS. IRVIN:  Your Honor, like I said, the defendant

9  is a danger to the community and therefore should be detained.

10  The defendant and his friends went into a store --

11        THE COURT:  Well, you don't need to repeat.  I

12  already know all that stuff, but if you have something other

13  than what you've already explained to me.

14        MS. IRVIN:  Well, Your Honor, it was in the middle

15  of the day.  He went into the store in the middle of the day

16  with a gun, and the person that was robbed was afraid for his

17  life.  He hid in the back of the store, and he continued to

18  contact police officers that he was afraid that because

19  Mr. Cooper lives in the neighborhood, Mr. Cooper is a Miami

20  Gardens resident, that he was casing the store, coming back to

21  the store and was maybe going to steal additional things or

22  hurt the victim in this case.

23        Additionally, the facts we've been able to gather

24  show that Mr. Cooper actually pays his phone bill at the

25  Mobile One store.  He's a customer there, and he robbed a

1    store that he frequents, that he's a customer, and

2    unfortunately that shows the government that he is ruthless

3    and unwilling to follow the law and to protect his community

4    and to be lawful in his own community, Your Honor.

5              Additionally, the government believes that based on

6    the facts, that this defendant has high sentencing exposure,

7    that he is a risk of flight.  His sentence, just based on the

8    fact that he was carrying the gun and he -- the facts show

9    that he has DNA evidence tying him to the robbery, his

10   sentence looks like 78 to 97 months potentially, and that's a

11   seven-year mandatory minimum for an 18 U.S.C., 924(c), because

12   he was the one that was brandishing the gun.

13             Additionally, like I said, he has numerous incidents

14   of leaving the scene of a crime and resisting arrest and

15   fleeing from the police.  This defendant is a well-known track

16   star, and there have been numerous incidents since he was 18

17   of the -- of being in contact with law enforcement officers,

18   and at the time that he contacted law enforcement officers

19   they tried to stop him to try to arrest him for a crime

20   committed, and he was able to actually run away because he's

21   unfortunately so fast.

22             So the government is seeking detention, like I said,

23   based on risk of flight and danger to the community, and there

24   is a rebuttable presumption in this case.

25             THE COURT:  Okay.  Ms. Chen, how would you like to

1  proceed?

2          MS. CHEN:  I'd like to question the officer, Your

3  Honor.

4          THE COURT:  Okay.  Let me ask you, Ms. Chen, are

5  those real books behind you, or is that a photo?

6          MS. CHEN:  Oh, gosh, Judge, that's a photo.  You

7  don't want to see what's behind me.

8          (Laughter.)

9          THE COURT:  All right.  So agent, turn on your

10  microphone, if you would, and raise your right hand.

11          Luis Gonzalez, Government's witness, sworn.

12          THE COURTROOM DEPUTY:  Could you please state and

13  spell your name for the record.

14          THE WITNESS:  Luis Gonzalez, L-u-i-s

15  G-o-n-z-a-l-e-z.

16          THE COURT:  Tell us who you work for, how long

17  you've worked there and what your position is.

18          THE WITNESS:  I work for the Miami Gardens Police

19  Department.  I'm a detective in the violent crimes unit, and

20  I'm also a task force officer with the FBI violent crimes task

21  force.

22          THE COURT:  Okay.  Does somebody have -- is that you

23  who has background noise going on?  You need to ask them to

24  turn that off, please.

25          THE WITNESS:  Yes.  One second, Judge.

```
 1              Sorry, Judge.
 2              THE COURT:  Are those your kids or other police
 3   officers?
 4              THE WITNESS:  Other police officers, sir.
 5              THE COURT:  They're worse than kids.
 6              THE WITNESS:  Yes.
 7              THE COURT:  All right.  Go ahead, Ms. Chen.
 8              MS. CHEN:  Thank you.
 9                        Cross-Examination
10   BY MS. CHEN:
11   Q    Officer Gonzalez, did you listen to the government's
12   proffer?
13   A    I did.
14   Q    Do you have any additions, deletions or corrections to
15   make to it?
16   A    I have none.
17   Q    Would you adopt it as your own?
18   A    Yes.
19   Q    Did Mr. Cooper make any statements in this case?
20   A    He did.
21   Q    What were they?
22   A    They were post-Miranda statements after interview at the
23   station.
24   Q    And what did he say?
25   A    Basically the same thing as the Assistant U.S. Attorney
```

1    has just stated.  Basically he said he got to the store with

2    the two friends, they sat outside, watched the store for a

3    while, then they proceeded to go inside the store and at

4    gunpoint pulled -- robbed the store.  He was the one holding

5    the gun, he claimed, and the other two had some bags as

6    they -- after he broke the glass case, the other put all the

7    cellphones in the bags, and they all took off running.

8    Q    Was that statement recorded?

9    A    Yes.

10   Q    How was it recorded?  Was it written down?  Was it audio?

11   Was it video?

12   A    It's audio and video recorded.

13   Q    Did anyone else make statements about Mr. Cooper's

14   alleged involvement?

15   A    Only the victim in this case, the store owner.

16   Q    And were those statements recorded?

17   A    No.

18   Q    Okay.  In Mr. Cooper's, what you say is his post-Miranda

19   statement, what did he say about the gun?

20   A    I don't understand the question.  What did he say about

21   the gun?

22   Q    Yes.

23   A    He said he discarded the gun.  First he said he gave it

24   to a neighbor, and then he said he lied about that and that he

25   just got rid of the gun.  He wouldn't tell me where.

```
 1   Q    Did he say anything about whether or not the gun was a BB
 2   gun, a replica or a legitimate gun?
 3   A    Yes, he started in the interview saying that it was a
 4   pelt gun.  Then further down in the interview, he actually
 5   described the gun and told me it was a .22 caliber.
 6   Q    Has the gun --
 7   A    Well, and that he had -- I'm sorry.
 8   Q    Has --
 9   A    And that he had only one bullet in the gun.
10   Q    Has the gun been recovered?
11   A    No, ma'am.
12   Q    In the government's proffer there was a discussion of two
13   other individuals.  Have those individuals been arrested?
14   A    No, ma'am.
15   Q    Did Mr. Cooper provide information about those two
16   individuals in his statement?
17   A    He provided two names, first names, but then he said he
18   really doesn't know them, doesn't know where they live,
19   doesn't know their personal information, doesn't know their
20   real names, nothing else.
21   Q    So in the video surveillance footage, have you reviewed
22   that before court today?
23   A    Yes, ma'am.
24   Q    I believe the government's proffer said that the three
25   individuals were wearing masks that cover the lower part of
```

```
 1   their face and hoodies, correct?
 2   A     They had, like, the common masks that people are using
 3   now for the COVID.
 4   Q     As well as hoodies, correct?
 5   A     (Inaudible) is that what you're asking?  Yes, they had
 6   hoodies, yes.
 7   Q     So would it be fair for me to say that the only part of
 8   their faces that were visible on camera and to the store
 9   employee would be their eyes and maybe the top part of their
10   nose?
11   A     Yes, ma'am.
12   Q     Now, you -- in the government's proffer there was a
13   discussion about crime scene showing up to the scene to take
14   DNA evidence.  How -- are you aware of when crime scene
15   arrived at the scene versus when the call was made?
16   A     Within the first 15 to 20 minutes I was present at the
17   scene.
18   Q     But it -- would it be fair to say that for that 15 to 20
19   minutes before you appeared on the scene and before crime
20   scene appeared on the scene, that the scene was not secure?
21   A     No, it was secured.
22   Q     It was secured, but --
23   A     It was.
24   Q     I guess my question is who secured it before you arrived
25   there?
```

1   A     The patrol officers on the road that responded.

2   Q     Okay.  And how long did it take the patrol officers to

3   respond after the call came in?

4   A     I couldn't give you an exact time.  I'm not too sure,

5   ma'am.

6   Q     Okay.  But would it be accurate for me to say that in the

7   time between the call and when the patrol officers arrived,

8   the scene was not secure?

9   A     Not secured as far as police is concerned, because we

10  actually block off the area, we don't allow anybody inside,

11  and, you know, we have an officer present.  So, yeah, before

12  that I couldn't tell you.

13  Q     Thank you.  Just one -- just two more questions.

14        The store employee in that case was not injured; is

15  that correct?

16  A     That is correct.

17  Q     And it looks like, if I'm not mistaken, approximately

18  seven months after the incident, in February of this year,

19  that employee claims to recognize Mr. Cooper and calls law

20  enforcement again, correct?

21  A     No, miss.

22  Q     No?

23  A     No.  I had that information before.

24  Q     Let me rephrase.  That the employee contacted law

25  enforcement a second time about this case in February, saying

1    that Mr. Cooper allegedly had returned to the store.

2    A    So in February was one instance of many that I made

3    contact, or that the victim made contact with me.  Several

4    times shortly after the actual incident took place, and then I

5    believe maybe in December at some point, Tyrese had returned

6    to the store, and then also in February.  The key about

7    February is that he got very worried, because at this point

8    Tyrese shows in the store with another male, and they're

9    actually, like, measuring the casings and just looking around,

10   and that made him very scared.

11   Q    Let's talk about that.  At that point, is it accurate to

12   say that Mr. Cooper and the other individual were not wearing

13   facemasks and were not in hoodies?

14   A    That is correct.

15   Q    Would it be also accurate to say that at that incident

16   neither of them were carrying firearms, correct?

17   A    I couldn't tell you.  They weren't exposed or shown in

18   the video.

19   Q    But that --

20   A    I don't know if they were carrying it.

21   Q    From what the employee could see and from what you could

22   see on the video, firearms were not brandished, would you

23   agree with that?

24   A    Were not brandished, that is correct.

25   Q    And at that point in that incident no glass was broken,

```
 1  no phones were taken, correct?

 2  A    That is correct.

 3  Q    And --

 4  A    We're talking about February -- miss, I'm sorry.  We're

 5  talking about February, correct?

 6  Q    We are.  We're still talking about February.

 7  A    Yes, okay.

 8  Q    And they arrived during regular business hours, when

 9  anybody in the public, me included, could go into the store

10  and look around, correct?

11  A    Yes.

12  Q    And it wouldn't be, for example, illegal for me to go

13  into the store and to hold my arms out.

14  A    No.

15  Q    Okay.

16  A    I don't see how that can be illegal, no.

17          MS. CHEN:  Okay.  Thank you very much.  No further

18  questions.

19          THE WITNESS:  You're welcome, miss.

20          THE COURT:  Ms. Chen, about 10 questions ago you

21  said you had two questions.

22          MS. CHEN:  I know, Your Honor.  I'm sorry.  I

23  promise in the future I'll give you eight questions back.

24          THE COURT:  Okay.  Ms. Irvin, do you have anything

25  for the agent?
```

1          MS. IRVIN:  No, Your Honor.

2          THE COURT:  Okay.  Ms. Chen, you have any evidence

3  or argument?

4          MS. CHEN:  Just argument, Your Honor.

5          THE COURT:  Okay.  Go ahead.

6          MS. CHEN:  In this case, given Mr. Cooper's lack of

7  criminal history, his lifelong ties to the community, the fact

8  that his mother, Mrs. Cooper, is on the Zoom today, and the

9  extraordinary support that he has received from his family, I

10  would propose to the Court a hundred thousand dollar personal

11  surety bond to be cosigned by Mr. Cooper, as well as his

12  mother, Christina Cooper.  That would be in addition to a

13  $70,000 five percent bond, and the $3500 in cash that would

14  need to be deposited with the Court's registry would come a

15  hundred doll -- sorry, a thousand dollars from his mother,

16  Christina, from her income tax refund; $2000 from Cache Givens

17  (phonetic), who is -- with whom he shares a child -- she works

18  as a correctional officer in Georgia -- and then $600 from a

19  close family friend named Samantha, who has served as a second

20  mother to Mr. Cooper, and that $600 would be from Samantha's

21  paycheck.

22          He could reside with his mother at 1255 Hyacinth

23  Place, in West Palm Beach, Florida, 33414.  They would be

24  willing to sign up for a landline so that probation could

25  engage in 24/7 GPS monitoring.  At that residence with his

1    mother also lives his stepfather, Mr. Johnson, who works as a

2    forklift driver.  Also living there is his stepsister, Tiara

3    Johnson.

4            I have reached out to Mr. Cooper's track coach, who

5    is in Clermont, Florida.  As the Court can see from the

6    Pretrial Services report, Mr. Cooper is an accomplished and

7    contracted track star who has also worked in construction.

8            I have spoken with his family, who are willing to

9    ensure that he arrives for all court appearances.  I think it

10   is notable for the Court that Mr. Cooper does not have any

11   criminal history.  I understand that the government proffered

12   a number of cases, including trespass onto school property

13   when Mr. Cooper was 17, resistance without violence, a traffic

14   incident; however, it is notable that the state attorney's

15   office in each and every one of those cases found the evidence

16   against him wanting and nol. prossed or no-actioned the cases.

17           In terms of the specific offense conduct in this

18   case, while I have not had the opportunity to review the

19   recorded post-Miranda statement that officer Gonzalez

20   testified about, I think if officer Gonzalez's

21   characterization of that recorded statement is correct,

22   Mr. Cooper is somebody who immediately accepted responsibility

23   for his actions, despite the fact that he was under no

24   obligation to speak with law enforcement, he identified two

25   other individuals, and this shows the Court that he is

1    somebody who wants to accept ownership, he wants to put this

2    behind him, and this is somebody who did not flee when

3    approached by law enforcement in this case, and his actions

4    demonstrate that he is somebody who would make his court

5    appearances.  He understands the sacrifices that his family

6    would have to make to deposit that five percent bond with the

7    Court, and I think that the conversations I have had with his

8    family and with Mr. Cooper demonstrate how seriously they

9    undertake this obligation.

10          And unless the Court has any further questions or

11   comments, I would rest on that.  Thank you.

12          THE COURT:  Okay.  I find this offense carries a

13   penalty in excess of 10 years and involves a violent crime;

14   therefore, there's a presumption as to risk of flight and

15   danger to the community.

16          The weight of the evidence against the defendant is

17   substantial.  The government has proffered that he entered a

18   store with two other people.  He, himself, carrying a gun,

19   pointed it at the employee, broke the glass case, and the

20   other folks with him stole a number of guns (sic) at the

21   T-Mobile store.  Subsequent analysis revealed that blood on

22   the counter and on the doorknob matched the DNA of Mr. Cooper,

23   whose DNA was in a database, apparently.

24          This also goes for the probable cause finding, as

25   well.

1        After arrest, Mr. Cooper -- you know, I don't

2  necessarily agree, Ms. Chen, that he accepted responsibility.

3  He did admit his participation but seemed to minimize it by

4  indicating that he had a pelt gun, subsequently agreeing that

5  it was a .22 and ID'ing two people with him by first name or

6  nickname only, without knowing their full names or being able

7  to tell the officer where they resided or where they hung out

8  is not necessarily full responsibility for what happened.  But

9  I do agree that he did at least accept his responsibility for

10 having been there and participated in the robbery.

11        I find that I could set -- that the government has

12 failed to show by a preponderance of the evidence that no

13 condition or combination of conditions would reasonably assure

14 the appearance of the defendant as required at future

15 proceedings.  The defendant has been a resident of South

16 Florida for his entire life other than a short period in

17 Oregon and Mississippi, where he attended school in

18 Mississippi.  He's got a -- apparently a good family here, a

19 mother, he's got a stepfather who will agree to have him live

20 with him, as well as post money in insurance of his future

21 appearance here in court.  So I find that I could set

22 conditions that would assure me that he would appear.

23        The government makes the argument that he had

24 previously resisted an officer without violence, as well as

25 left the scene of an accident.  Those both occurred when he

1    was 18 years old.  And I do note, as Ms. Chen indicated, that

2    his criminal record is not extensive.  There are a few

3    arrests, but all were either nol. prossed or no-actioned.  And

4    I do find that if I -- I could order house arrest, as Ms. Chen

5    suggests, and assure that he be present.

6           However, I find by clear and convincing evidence

7    that no condition or combination of conditions would

8    reasonably assure the safety of the community.  This is a

9    difficult case, and Ms. Chen, I think you made a very good

10   presentation, but what I'm concerned about is that his use of

11   a firearm, pointing it at a victim and participating in a

12   violent robbery.  And so I find that there are no conditions

13   that I could set that would assure the -- that the community

14   is safe.  I also find that there's a rebuttable presumption

15   here that he is a danger to the community that I find has not

16   been rebutted due to his use of the firearm during the alleged

17   robbery.

18          In addition, he continued to return to the store

19   after the robbery on numerous occasions, which caused the

20   clerk there or the owner -- I'm not sure if he was a clerk or

21   the owner, but at least the employee there -- to be in fear.

22          So for all those reasons, I order that he be

23   detained pending trial in this matter.

24          Anything else for Mr. Cooper?

25          Oh, hold on one second.  I'm sorry.  Oh, yeah, I

```
 1   also find that probable cause has been established, as I

 2   recited the facts of the case.

 3              And so we'll set the arraignment for March 22nd at

 4   10:00 o'clock.

 5              Anything else from either side?

 6              MS. IRVIN:  Not from the government, Your Honor.

 7              THE COURT:  Okay.

 8              MS. CHEN:  No, Your Honor, thank you.

 9              THE COURT:  All right.  Thank you both.

10              All right.  Mr. Cooper, if you would let the

11   corrections officer know that you're done, please.  Thank you.

12              All right.  Anything else for the Court?

13              MS. IRVIN:  Not from the government, Your Honor.

14              MS. CHEN:  Not from the defense, Your Honor.  Thank

15   you.

16              THE COURT:  All right.  Anything else for the Court?

17              Sherry, do you need to talk to the probation

18   officer, or no?

19              THE COURTROOM DEPUTY:  No, because the person was

20   detained, Judge.

21              THE COURT:  Okay.  All right.  So the rest of you

22   can leave the Zoom.  I'm going to talk to my two interns about

23   what a great job you both did.

24              MS. IRVIN:  Thank you, Your Honor.

25          (Proceedings concluded.)
```

```
 1                          * * * * *

 2                          I N D E X

 3  Testimony of Luis Gonzalez

 4          Cross by Ms. Chen                    11

 5                          * * * * *

 6                      E X H I B I T S

 7  (None.)

 8                          * * * * *

 9                      CERTIFICATE

10      I, Stephen W. Franklin, Registered Merit Reporter, and

11  Certified Realtime Reporter, certify that the foregoing is a

12  correct transcript, to the best of my ability, from the

13  DIGITAL AUDIO RECORDING of proceedings in the above-entitled

14  matter.

15      Dated this 17th day of APRIL, 2021.

16

17      /s/Stephen W. Franklin
        _____
18      Stephen W. Franklin, RMR, CRR

19

20

21

22

23

24

25
```